UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JAMES P. GRANGER** | **CIVIL ACTION NO. 14-cv-45** |
| **VERSUS** | **SECTION "C"** |
| **ODYSSEA VESSELS, INC., ET AL** | **HON. HELEN BERRIGAN** |

## OPINION

This case concerns a personal injury claim made by Joni Hawkins, the personal representative of the estate of James P. Granger ("Granger"), against several defendants. The defendants are Odyssea Marine, Inc., Granger's employer; Odyssea Vessels Inc., the owner of the vessel upon which the injury occurred; and Apache Corporation, which hired the vessel to perform work at the time the injury occurred. The Court held a bench trial on March 16, 2015.[1] Having considered the testimony and evidence at trial, the depositions submitted in lieu of live testimony, the arguments of counsel, and the applicable law, the Court now enters the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).[2] Specifically, the Court finds that Odyssea Marine, Inc., is vicariously liable to plaintiff for failing to avoid or minimize hazardous conditions when its employee, James Granger,

---

[1] (Rec. Doc. 50.)
[2] To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

1

retrieved the M/V ODYSSEA DYNAMIC's mooring line. The Court finds that Granger is also liable for failing to minimize the hazardous conditions of the line retrieval operation. Plaintiff shall be liable for fifteen (15) percent of his own damages; Odyssea Marine, Inc. shall be liable for eighty-five (85) percent.

## I. FINDINGS OF FACT

Granger began working for Odyssea Marine as a deckhand and engineer on March 6, 2012.[3] When he began employment, he did not have preexisting major medical conditions. Specifically, the evaluating physician noted that he did not exhibit any scarring on his spine or knees.[4] Prior to beginning employment with Odyssea Marine, Granger received safety related training, including training to identify weather hazards.[5] Granger received uniformly positive ratings in all aspects of his work, including safety and security.[6]

On April 19, 2013, Granger was injured while working as a deckhand aboard the M/V ODYSSEA DYNAMIC ("DYNAMIC"). On that day, in addition to Granger, Captain Mark Nevala and Arthur Muntz, a captain in training, were on deck. Captain Muntz was classified at the time as a captain in training.[7] Captain John Cumbie and deckhand Jesse Ferrell were on board the ship but off duty.[8] This particular voyage was his first time working on the DYNAMIC as a training captain.[9]

---

[3] (Trial Transcript at 29:20-22; ex. 1 at 7, 33, 34)
[4] (Ex. 1 at 8.)
[5] (Trial Tr. at 30:6-24-31:14-19.)
[6] (Ex. 17.)
[7] (Trial Tr. at 50:22-25.)
[8] (Ex. 16.)
[9] (Trial Tr. at 52:17-22.)

The DYNAMIC was secured to Eugene Island 309G.[10] The daily weather report showed that there was visibility for two nautical miles due to rain and wind moving from the north at 30 to 35 knots, or roughly forty miles per hour.[11] In anticipation of the winds and seas from the north, the DYNAMIC was moved to the southwest corner of Eugene Island 309G, downward from where the wind was coming.[12] The vessel was secured to the platform by a 300-foot polypro bow line with a float on the end of it.[13] The line looped over a bit on the platform and wrapped around several bits at the front of the DYNAMIC.[14] At around 6 A.M., the crew received a report that weather was deteriorating.[15] At around 6:30 a.m., the Apache Corporation instructed the crew to return to Port Fourchon.[16] The seas at that time were at eight to ten feet, with some swells as high as ten to twelve feet.[17] As the deckhand, it was Granger's job to assist with unfastening the mooring line which secured the ship to the platform and then retrieving the line from the water.[18] Typically, the deckhand first unfastens the line from the bit at the bow of the vessel, then the captain positions the vessel so that the deckhand can use a grappling hook to retrieve the line from the water while standing at the stern of the vessel, "flip" the other end of the line off of the bit on the platform, and pull the line in.[19] Muntz testified that after Granger unfastened the line from the bow bit, Muntz backed up the boat to get it into position. At this time, Granger walked down the platform and was unexpectedly knocked down by a wave off the

---

[10] *(Id.* at 14:14-17.)
[11] (*Id.* at 13:10-14:13.)
[12] (*Id.* at 14:14-19.)
[13] *(Id.* at 21:17-24.)
[14] *(Id.* at 22:12-14, 53:13-23.)
[15] *(Id.* at 58:18-59:19. )
[16] (Ex. 16.)
[17] (Trial Tr. at 57:6-11.)
[18] (*Id*. at 59:20-60:25.)
[19] (*Id*.)

3

starboard stern corner that topped about two feet over the gunwale.[20] After getting up, Granger went up to the wheelhouse and discussed the situation with Nevala and Muntz.[21]

Granger suggested that instead of retrieving the mooring line from the stern of the vessel, he could attempt to perform the operation from the bow, which was roughly twenty feet above the water and less likely to be overtopped by large swells, whereas the stern was only about four feet above the waterline.[22] However, Nevala and Muntz rejected the idea, in part because of Muntz' relative inexperience as a training captain.[23] Instead, both Nevala and Muntz offered to go back out in Granger's place.[24] Although every crew member had the authority to stop work if the situation was thought to be unsafe, Granger assured Muntz and Nevala that he could bring the line in provided that he did not go onto the stern until the vessel was within range of the line; and Nevala and Muntz agreed.[25]

Granger went back out and successfully used a grappling hook to retrieve the line from the port stern, then moved the center stern to begin pulling the line in.[26] However, as he was pulling the line in, a second wave came over the stern of the vessel and knocked Granger over again.[27] Neither Nevala nor Muntz saw Granger fall from their vantage point in the wheelhouse, but they noticed after a time that the mooring line had gone slack and began to run back over the stern. Nevala thought something was wrong and went out to investigate. He found Granger "laying [sic] on the ground next to a bundle of pipes" on the stern. Granger said he thought he

---

[20] (Trial Tr. at 60:23-61:14.)
[21] *Id.*
[22] (Trial Tr. at 53:24-45:23; Ex. 16.)
[23] (Ex. 16.)
[24] (*Id.*; Trial Tr. at 63:7-8.)
[25] (Ex. 16; Trial Tr. at 61:21-62:11;Trial Tr. at 62:17-63:3.)
[26] (Trial Tr. at 63:15-19; 68:4-15.)
[27] (*Id.* at 64:1-3.)

had broken his leg. Nevala assisted Granger into the cabin.[28] Once inside, Nevala phoned Fontenot and they decided to leave the mooring line behind and head back towards Fourchon.[29] Nevala advised Granger to take ibuprofen and gave Granger a pack of frozen vegetables to reduce swelling.[30]

Once back on shore in Thibodeaux that evening, Granger saw a specialist in orthopedics, Dr. Richard Morvant.[31] Morvant observed "obvious signs of trauma", including swelling in the knee, apparent ligament damage, pain, and instability.[32] An MRI taken a short time later revealed that Granger had damaged his medial collateral ligament and exhibited significant edema, leading Morvant to conclude that Granger had injured his cartilage in the accident and required arthroscopic surgery on his knee.[33] During surgery on April 24, Morvant found several areas of acute damage such as cracked cartilage.[34] At a post-operation follow-up on May 2, Granger showed improvement.[35] Thereafter, Granger underwent rehabilitation treatment at a physical therapy center in Ocean Springs, Alabama.[36] On May 23, Morvant saw Granger again and found significant improvement. Granger no longer required crutches, appeared to show no pain, and was capable of a full range of motion. Morvant advised that Granger could return to work, but that he should not run, jump, twist, pivot, squat, or climb.[37] At a later check up on June 27,

---

[28] (Ex. 16.)
[29] (Trial Tr. at 21:3-23:3.)
[30] (Ex. 16.)
[31] (Ex. 25 at 6.)
[32] (*Id*. at 7.)
[33] (*Id*. at 9-10.)
[34] (*Id*.)
[35] (*Id*. at 13.)
[36] (*Id*. at 14-15; Ex. 19.)
[37] (Ex. 25 at 16.)

5

Morvant again found improvement and recommended that Granger could return to work with the same limitations that he had noted in the May 23 appointment.[38]

On July 12, Granger resumed working for Odyssea Marine. He worked two brief stints as a deckhand from July 12-15 and then from July 17-23, 2013.[39] On July 25, Granger was evaluated by a physician from All Industrial Medical Services chosen by Odyssea Marine and found to be capable of returning to work without limitation.[40] Thereafter, Granger worked on the DYNAMIC from July 31 to August 7 as an unlicensed engineer.[41]

Immediately upon returning to shore on August 7, Granger visited the emergency room at Thomas Hospital in Fairhope, Alabama.[42] Granger reported experiencing dull and throbbing pain in his low back that radiated into his right hip. The physician found that he showed tenderness around his right knee and hip.[43] The physician diagnosed Granger with sciatica and administered injections of morphine, dexamethasone and hydromorphone.[44]

On August 12, Granger visited Dr. Allen Johnston, an orthopedic surgeon in New Orleans, who found that Granger suffered chronic right knee pain, symptoms of overuse in his left knee, and chronic low back strain with possible pinched nerve in his right leg.[45]

Subsequently, Granger returned to work on August 21 and worked until September 19. This was the last time that Granger worked for Odyssea Marine.[46]

---

[38] (*Id*. at 16-17.)
[39] (Ex. 4.)
[40] (Trial Tr. at 32:24-33:12; Ex. 13.)
[41] (Ex. 4.)
[42] (Ex. 21 at 38.)
[43] (*Id*. at 45-46.)
[44] (*Id*. at 49, 52.)
[45] (Ex. 22 at 2.)
[46] (Ex. 4.)

On September 24, Granger again visited the Thomas Hospital Emergency Department where he was again diagnosed with low back pain with sciatica.[47]

On October 21, Granger saw Dr. Johnston again, complaining that his back pain had increased since his last visit in August. Johnston recommended that Granger was only capable of sedentary duty due to his right knee condition and back and right leg pain.[48]

On November 19, Morvant evaluated Granger and found that Granger had likely either reinjured or exacerbated his knee injury, likely by engaging in overly strenuous work before his knee had adequately recovered.[49] Morvant discussed limiting Granger's work duties and continuing with rehabilitation treatment.[50]

On December 16, an MRI ordered by Dr. Johnston showed internal derangement of his lower back at the 3-4 and 4-5 disks, as well as facet arthrosis. Granger reported that he experienced shooting pain in his back on a daily basis and had difficulty sleeping and walking.[51]

On January 2, 2013, Morvant evaluated Granger and found that he was could return to work, but that his injured ligament and posttraumatic chondromalacia could impede his ability to do the "strenuous" type of work that he had been engaged in when he was injured. Morvant cautioned that it would be "an excellent idea" to engage in less strenuous work, and that although Granger was not required to wear a brace, he should "be careful."[52] Morvant assigned Granger a 5% partial permanent physical impairment of his right knee.[53]

---

[47] (Ex. 21 at 35.)
[48] (Ex. 22 at 3.)
[49] (Ex. 25; Trial Tr. at 19:9-21:13.)
[50] (Ex. 25; Trial Tr. at 21:11-20.)
[51] (Ex. 22 at 9.)
[52] (Ex. 25; Trial Tr. at 26:5-24.)
[53] (Ex. 25; Trial Tr. at 27:4-28:3.)

During the period after the accident, Granger ceased to engage in activities that he formally took part in. According to his daughter, Jodi Hawkins, whereas Granger had formerly "babied" his truck, after the accident he stopped cleaning it on a regular basis. He also became socially withdrawn and played with his grandchildren less. When he was at home, he "went into a little hole" and was visibly in pain.[54] On February 21, 2014, Granger died of a heart attack.[55]

## II.    PROCEDURAL HISTORY

Plaintiff initiated this action seeking maintenance and cure, Jones Act damages, and damages for unseaworthiness.[56] The parties did not make dispositive motions prior to trial. The Court held a bench trial on March 16, 2015.[57] At the close of trial, defendants moved for partial judgment pursuant Fed. R. Civ. P. 52(c) that plaintiff's claims against the Apache Corporation, claims against Odyssea Vessels, Inc., claim for maintenance and cure under general maritime law, and claims against Odyssea Marine for negligence under the Jones Act be dismissed. The Court granted the motion as to plaintiff's claims against Apache and Odyssea Vessels, and as to plaintiff's claim for maintenance and cure. The Court denied the motion as to plaintiff's claim against Odyssea Marine under the Jones Act.[58] Accordingly, the Court will address plaintiff's Jones Act negligence claim here.

## III.    CLAIMS & DEFENSES

Plaintiff argues that Odyssea Marine is vicariously liable for negligence in numerous respects, which can be summarized as failing to appropriately respond to the rough conditions at

---

[54] (Trial Tr. at 100:8-101:19.)
[55] (Rec. Doc. 30 at 10.)
[56] (Rec. Docs. 1, 50.)
[57] (Rec. Doc. 50.)
[58] (Trial Tr. at 103:25-105:22.)

8

sea; failing to take appropriate steps to minimize the risks posed by retrieving the mooring line; disregarding forecasts about imminent stormy weather; failing to identify, avoid or minimize hazardous conditions of the line retrieval operation; and failing to provide priority medical care following Granger's injury.[59]

Odyssea Marine contends in its defense that Granger was at fault for his injury, or that his fault was a superseding or intervening cause of the incident.[60]

## IV. CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §1333. Venue is proper in this district.

A. Standards for Analysis

The Jones Act, 46 U.S.C. §30104(a), gives a seaman a cause of action against his employer for negligence.[61] A Jones Act employer owes a seaman a duty of reasonable care.[62] The employer is liable to the seaman if his negligence is the cause, in whole or in part, of his injury.[63] The Jones Act simultaneously obligates the seaman to act with ordinary care under the circumstances, with respect to his own well-being.[64] "The common-law defense of 'assumption of risk' is not available as a defense to an action under the Jones Act.[65]

---

[59] (Rec. Doc. 30 at 12-13.)
[60] (*Id*. at 13-14.)
[61] *Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 415, 129 S.Ct. 2561, 2570 (2009).
[62] *Verret v. McDonough Marine Serv.*, 705 F.2d 1437, 1441 (5th Cir. 1983).
[63] *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997) (en banc).
[64] (*Id*. at 339.)
[65] *Massey v. Williams-McWilliams, Inc.*, 414 F.2d 675, 678, n. 6 (5th Cir. 1969).

Comparative negligence applies under the Jones Act, "barring an injured party from recovering for the damages sustained as a result of his own fault."[66] The defendant has the burden to prove plaintiff's negligence and a causal relationship with his injury.[67] A seaman's contributory negligence will not bar his recovery, but may reduce the amount of damages owed proportionate to his share of fault.[68] A defendant must bear responsibility if his negligence played any part, even the slightest, in producing an injury.[69]

B.  Analysis of Claims and Defenses

1.  *Odyssea Marine was not negligent for failing to pick up lines while weather remained calm*

In the pretrial order, plaintiff argues that defendant was negligent for "failing to pick up lines while weather remained calm" and disregarding forecasts about imminent stormy weather.[70] The evidence submitted does not support this argument. Muntz testified that around roughly 6:00 a.m. the crew learned that the wind had changed direction and that weather conditions were deteriorating.[71] The incident report written up by Captain Nevala following Granger's injury, which was admitted into the evidentiary record, indicates that at 6:30 a.m. the crew was told to head back to Fourchon because of the weather conditions, and that the line retrieval operation began approximately fifteen minutes later at 6:45 a.m.[72] Given these circumstances, the Court finds that Odyssea Marine did not negligently delay "picking up lines" and departing from the

---

[66] *Miles v. Melrose*, 882 F.2d 976, 984 (5th Cir. 1989) *aff'd sub nom. Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275.
[67] *Id.*
[68] *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006).
[69] *Chisholm v. Sabine Towing & Transp. Co.*, 679 F.2d 60, 62 (5th Cir. 1982) (citing *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957)).
[70] (Rec. Doc. 30 at 12.)
[71] (Trial Tr. at 58:1-23.)
[72] (Ex. 16)

platform. In fact, the testimony shows that the crew acted promptly on orders to return to Port Fourchon.

### A. *The master of the DYNAMIC was not negligent for failing to be on the bridge at the time of the incident*

Plaintiff claims that the master of the DYNAMIC was negligent for failing to be on the bridge at the time of the incident.[73] Although Muntz's testimony and the incident report establish that the DYNAMIC's master, John Cumbie, was not on the bridge at the time of the incident, Captain Nevala was in the wheelhouse with Muntz and actively monitoring the line retrieval operation.[74] Plaintiff has not shown that Cumbie would have offered better supervision or that a different course of action would have been taken under Cumbie's command. Thus, the Court finds that this claim has no merit.

### B. *Improper positioning and handling of the DYNAMIC did not cause or contribute to Granger's accident and injuries*

Plaintiff also claims that improper positioning and handling of the DYNAMIC caused or contributed to Granger's accident and injuries.[75] However, no evidence supports this argument. Although the incident report indicates that Nevala felt uncomfortable allowing Granger to retrieve the line from the bow of the ship given Muntz's relative inexperience, Nevala also based this decision on the poor weather conditions.[76] Furthermore, Muntz's testimony shows that although it was possible to retrieve the mooring line while the deckhand was stationed at the bow

---

[73] (Rec. Doc. 30 at 13.)
[74] (*Id*.; Trial Tr. at 62:10-16.)
[75] (Rec. Doc. 30 at 13.)
[76] (Ex. 16.)

of the vessel, this method was not advisable in rough seas.[77] Muntz testified that while retrieving the line from the bow offered greater protection from oncoming swells, the vessel was more likely to hit the platform or throw the deckhand into the waters, and that he had witnessed such accidents occur in rough weather.[78] Plaintiff did not present evidence to rebut Muntz's testimony on the hazards of retrieving the mooring line from the bow or to show that Muntz otherwise mishandled the vessel. Accordingly, the Court finds that improper handling of the vessel did not cause or contribute to the accident.

> *C. Odyssea Marine was negligent in failing to avoid the hazardous conditions of the line retrieval operation*

Plaintiff claims that Odyssea Marine is vicariously liable for the negligence of its employees in insisting that Granger retrieve the mooring line in spite of the rough seas, thereby placing him in an unnecessary position of danger. Rec. Doc. 30 at 12. The Court agrees. Employers have a duty to perform operations in a manner that would not create unreasonable risk to safety. *Givens v. M/V/ Calypso*, 540 F.Supp. 12, *15 (W.D. Wa. 1982). The seas on that day ranged between eight to ten feet with occasional twelve foot swells.[79] The incident report listed rain and significant winds.[80] Although Muntz testified that he did not feel that the weather was so rough that the line retrieval operation should have been called off, in an interview shortly after the incident, Muntz stated that it was "too rough to be back loading stuff" at the time.[81] Indeed, the Court's review of case law on this matter shows 8 to 12 foot seas to be significantly higher than what is normally regarded as safe for back deck operations such as loading and unloading cargo.

---

[77] (Trial Tr. at 77:2-79:11.)
[78] (*Id*. at 77:9-19.; 79:6-11.)
[79] (Ex. 16; Trial Tr. at 69:11-15.)
[80] (Ex. 16.)
[81] (Ex. 24 at 8.)

*See, e.g., Hebron v. Union Oil Co. of California,* 634 F.2d 245, 247 (5th Cir. 1981); *Tarlton v. Exxon*, 688 F.2d 973, 976-77 (5th Cir. 1982); *Mottler v. Operators, Inc.*, Civ. A. 87-5265, 1988 WL 135158, *3-4 (E.D. La. 1988).

Specifically, the Court finds that Odyssea Marine was negligent in sending Granger back out to retrieve the line after he had already been knocked over the first time. Muntz's testimony shows that neither he nor Nevala had a view of the stern where Granger was knocked over by the first wave.[82] Thus, the Court grants less deference to their evaluation that the retrieval operation could be safely performed even after Granger had been knocked over by a large swell. Indeed, the fact that Granger, an experienced seaman without a history of previous accidents, had fallen on the first attempt should have put the other crew members on notice that further injury from large swells was likely. Furthermore, though Muntz claimed that both he and Nevala offered to perform the operation for Granger, the Court finds it likely that this suggestion would have put greater pressure on Granger to go out a second time, rather than asking his crewmates to do so on his behalf. Finally, the testimony shows that eventually the crew decided to leave the mooring line attached to the platform so that it could be retrieved on a later date when the seas were calmer. For these reasons, the Court finds that Granger's injury following his first fall was foreseeable and that Odyssea Marine was negligent in continuing with the line retrieval operation.

D. *Granger was contributorily negligent for failing to avoid the hazardous conditions of the line retrieval operation*

---

[82] (Trial Tr. at 66:12-25.)

Defendants argue that Granger was solely at fault for a variety of reasons, including placing himself in a position of danger, failing to pay attention to his surroundings, standing where he should not have been standing, not paying attention to his job, failing to perform his job properly, failing to heed rules of safety and common sense, and failing to put himself in a safe, stable position on the stern deck of the vessel.[83] At trial, Muntz testified that prior to sending Granger out a second time to retrieve the line, Muntz advised Granger to walk up the port side of the ship while pulling in the line, rather than pulling in the line while standing on the vessel's stern.[84] Muntz claimed that because Granger failed to heed his advice, the injury was due entirely to Granger's fault.[85] However, the Court finds this testimony unreliable for several reasons. First, it is directly contradicted by the account he gave shortly after the incident. In an interview a few days after the accident, Muntz related that the accident was due primarily to the condition of the seas at the time.[86] When confronted with this conflicting version of events at trial, Muntz conceded that the rough seas were the "main reason" for Granger's injury, rather than Granger's decision to stand on the deck's stern.[87] Furthermore, Muntz admitted that he was not able to see the stern deck where Granger was purported to be standing because his line of vision was blocked by several large tanks positioned at the stern of the vessel.[88] Thus, the Court finds that Muntz could not have seen clearly the conditions of the first swell that knocked Granger over. Also, his admonition to Granger that he could avoid being hit by another swell by walking up the port side of the ship therefore carries less weight. Finally, Muntz also stated at trial that the reason for walking a line up the port side was to avoid the line getting pulled into

---

[83] (Rec. Doc. 30 at 11.)
[84] (Trial Tr. at 68:20-69:1.)
[85] (*Id*. at 68:25-69:1.)
[86] (Ex. 24 at 21.)
[87] (Trail Tr. at 81:9-19.)
[88] (*Id*. at 66:10-25.)

the rear propeller, not to avoid ocean swells.[89] Thus, while Granger would have been better advised to walk up the port side, where he could have been spared the full force of the second swell, the Court finds that his failure to do so does not render him solely at fault for his injuries. Rather, "contributory negligence is applicable to mitigate damages when a seaman is injured if alternative courses of action are available to the injured party, and he chooses the unreasonable course." *Simeonoff v. Hiner*, 249 F.3d 883, 888-89 (9th Cir. 2001) (internal quotations omitted). *See also*, *Movible Offshore Co. v. Ousley*, 346 F.2d 870, 873-74 (5th Cir. 1965). Accordingly, the Court finds that Granger is contributorily negligent for opting to walk towards the center stern of the vessel when retrieving the line, rather than walking the line up the port side as Muntz claims to have advised.

Furthermore, defendants contend that Granger was the sole cause of his alleged injury because he failed to exercise "stop work authority."[90] However, the Fifth Circuit has held that "a seaman may not be held contributorily negligent for carrying out orders that result in his own injury, even if he recognizes probable danger." *Williams v. Brasea, Inc. and Vessel Ciapesc I*, 497 F.2d 67, 73 (5th Cir. 1974). Thus, the Court finds that Granger's failure to exercise stop work authority does not absolve Odyssea Marine of liability.

*E. Damages*

Having determined the liability issues in this case, the Court must determine whether there is a causal nexus between Odyssea Marine's negligence and the injuries noted in Plaintiff's

---

[89] (*Id*. at 88:1-14.)
[90] (Rec. Doc. 30 at 11.)

complaint. Plaintiff seeks to recover for Granger's injuries to his right knee, hip, back, neck, shoulder, head, and other bones, muscles, joints and nerves.[91]

Plaintiff has shown by a preponderance of the evidence that there is a causal nexus between his knee injury and the accident aboard the DYNAMIC. Dr. Richard Morvant testifies that on the evening of April 19, he examined Granger and found that he showed swelling, pain, and instability in his medial collateral ligament.[92] An MRI performed a few days later confirmed that he had damaged a ligament and cartilage in his knee.[93] On April 24, Granger underwent arthroscopic surgery on his right knee. According to Morvant, the surgery showed signs of both chronic damages as well as acute damage. Morvant testified that he believed with a reasonable degree of medical certainty that the conditions that required surgery had more likely than not been caused by the accident on the DYNAMIC.[94] He elaborated that the damage to his knee, which included pain, swelling and looseness, was compatible with an acute injury.[95]

Plaintiff has also shown that causation exists between the accident and the back injury which Granger subsequently developed. Although Granger initially showed improvement following his knee surgery, on August 7, 2013, after returning to work in July, Granger visited an emergency room in Alabama presenting low back pain radiating down his right leg and was diagnosed with sciatica.[96] On August 12, Granger was examined by Dr. Allen Johnston, an orthopedic surgeon, who found that he suffered from chronic right knee pain following his arthroscopic surgery, overuse of his left knee, and chronic low back strain with possible right leg radiculopathy.[97]

---

[91] (Rec. Doc. 1 at 3.)
[92] (Ex. 25; Trial Tr. at 7:14-21.)
[93] (Trial Tr. at 9:12-25.)
[94] (*Id*. at 10:10-11:23.)
[95] (*Id*. at 12:24-13:1.)
[96] (Ex. 21 at 19, 68.)
[97] (Ex. 22 at 1-2.)

Johnston linked these conditions to Granger's injury aboard the DYNAMIC.[98] An MRI confirmed that several disks in Granger's lower back had suffered damage.[99] Prior to the accident, Granger did not have a history of back issues, but Johnston's reports show the development of painful back conditions in the months following Granger's injury.[100]

Although defendants suggest that Granger may have injured his back by attempting to dig his truck out after it became stuck in sand, the evidence does not support that this activity had a significant impact on either his knee or back.[101] Granger attempted to dig his truck out the night of May 21, 2013.[102] However, he did not begin experiencing back pain until early August, after working with Odyssea Marine for roughly a week.[103] Indeed, on May 27, 2013, Dr. Morvant evaluated Granger and found that his injuries had improved to the point that he no longer needed crutches, had regained full mobility, and could return to work with some restrictions.[104] Thus, the Court finds it more likely than not that the sciatica and derangement of disks in his lower back was caused by the injury he suffered aboard the DYNAMIC, and exacerbated by subsequent periods spent working for Odyssea Dynamic.

Under the circumstances, the Court will award plaintiff $70,000 in damages, as follows:

- Lost Wages: $22,000
- Mental anguish and physical pain and suffering: $32,000
- Medical care: $16,000

---

[98] (*Id.*)
[99] (Ex. 22 at 9.)
[100] (*Id.*)
[101] (Rec. Doc. 30 at 8.)
[102] (Ex. 19 at 14.)
[103] (Ex. 21.)
[104] (Ex. 25 at 16.)

### V. Conclusion

Odyssea Marine is 85% liable for the injuries that Granger sustained on April 19, 2013. Those injuries included a damaged medial collateral ligament and chondromalacia in his right knee, damage to the disks of the lower spine, associated pain and suffering, and costs of medical treatment. As such, plaintiff is entitled to recover $59,500 from Odyssea Marine. Judgment shall enter accordingly.

New Orleans, Louisiana on this 18th day of June, 2015

_____
UNITED STATES DISTRICT JUDGE